**JON M. SANDS**
Federal Public Defender
**MICHAEL P.P. SIMON**
Assistant Federal Public Defender
State Bar No. 013096
mike_simon@fd.org
407 West Congress, Suite 501
Tucson, Arizona 85701-1716
Telephone: (520) 879-7500
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | |
|              Plaintiff, ) | CR-09-2075-TUC-JMR |
| ) | |
| vs. ) | SENTENCING MEMORANDUM |
| ) | |
| Jesse Shawn Wewa, ) | |
| ) | |
|              Defendant. ) | |

The defendant, Jesse Shawn Wewa, by and through undersigned counsel, hereby submits the following Sentencing Memorandum for the court's consideration.

RESPECTFULLY SUBMITTED: January 7, 2011

JON M. SANDS
Federal Public Defender

*s/ MICHAEL P.P. SIMON*
Assistant Federal Public Defender

Copy delivered electronically this date to:

Jesse J. Figueroa, Assistant United States Attorney

Alberto Romero, Senior U.S. Probation Officer

# MEMORANDUM

Mr. Wewa entered a plea agreement on June 21, 2010, whereby he pled guilty to count 2 of the indictment, that on or about August 5, 2009, he intentionally and forcibly assaulted, resisted, opposed, impeded, intimidated, and interfered with Corrections Officer Joe Contreras, an officer of the United States, while said officer was engaged in and on account of the performance of his official duties and in the process inflicted bodily injury upon Corrections Officer Contreras in that he punched him in the face and wrestled with him, causing him to injure his knee. The written plea agreement establishes a series of ranges starting at 18-30 months for criminal history category III and culminating at 33-41 months for criminal history category VI. The parties agree that the sentence imposed will be consecutive to the sentence that the defendant is currently serving. Additionally, if sentenced in accordance with the plea agreement, the defendant waives his right to appeal or collaterally attack the conviction and sentence.

**Factual Basis/Acceptance of Responsibility**

The plea agreement contains the following stipulation regarding the underlying facts of the offense:

> "On or about August 5, 2009, Jesse Wewa was an inmate in the Federal Correctional Facility, Tucson, Arizona. Staff instructed Wewa to change his clothing because the clothing was too baggy. Wewa was escorted to the laundry facility. Wewa became involved in an altercation with Corrections Officer Joe Contreras. Wewa wrestled with Contreras causing Contreras to injure his knee. At the time of the incident Corrections Officer Joe Contreras was an officer of the United States and was engaged in the performance of his official duties." (Page 5.)

The government's disclosure included statements describing what happened by both officers involved. Mr. Wewa was walking out of the dining room when Officer Contreras ordered him to go change his pants in the laundry room because they were too big. (This was regarded as a safety violation because "weapons can be concealed in oversize prison uniforms.." It should be noted that no weapons were ever found concealed in the oversized pants.) Once in the laundry room, Mr. Wewa refused to comply with the

1  instructions he was being given, and a verbal altercation escalated into a struggle
2  involving Officer Contreras, and the Laundry Room Supervisor, Officer Hollembaek..
3  According to both officers, during a pat down, Mr. Wewa swung at Hollembaek and then
4  both officers took him to the floor and placed handcuffs on him without further incident.
5  Mr Wewa was examined later by BOP Health Services and found to have lacerations to
6  his forehead, neck and shoulder, bruising, and his head had contusions and was tender to
7  the touch. According to the PSR, Hollembaek's injuries did not appear serious. But
8  Contreras sustained a knee injury that required surgery to repair. (PSR, page 4).
9        Mr. Wewa accepted responsibility for the offense of conviction and agreed
10 with the factual basis of the plea agreement. He indicated that he thought he was being
11 singled out for unfair treatment, felt cornered by the two officers, and lost control.
12 He said he had no history of bad relations with the officers and apologized for his actions.
13 (PSR, page 5) Officer Contreras similarly indicated he had never had any bad interactions
14 with Mr. Wewa..(PSR, page 4).
15       The facts of this case reveal the following:
16  - no evidence that Mr. Wewa engaged in some kind of premeditated/planned attack;
17  - no evidence that Mr. Wewa singled out a particular officer because of previously poor
18    personal relations;
19 - no evidence that Mr Wewa had in fact secreted a weapon in his over-sized pants which
20   was the apparent rationale behind the decision to make him change his pants;
21 - no evidence that any weapon was involved whatsoever in this brief struggle between
22   Mr. Wewa and the two officers;
23 - no evidence that Mr. Wewa intentionally aimed a blow/kick/strike at Officer Contreras's
24   knee.
25       Based on the particular facts in this case, it is respectfully suggested that the
26 plea agreement ranges negotiated in this case are, in fact appropriate, indeed far more
27 appropriate and reasonable than the "advisory" guideline range sentence which the PSR
28

recommends, which would impose a disproportionate and draconian sentence under unwarranted circumstances.

**18 U.S.C. § 3553(a) (1) : The History and Characteristics of the Defendant**

Mr. Wewa is 29 years of age. His parents were Vincent Garcia and Lois Wewa. Shortly after his birth, his parents separated and he has not had any contact with his father since. Lois raised him on her own until around 1988, when she married Charles Lesarlley. Jesse and his step father initially had good relations but this began to change when he was 15. They both had substance abuse issues which negatively affected their relationship. He continues to maintain good relations with his mother who has written in support of her son. She writes that since his original incarceration in 2005 there "has been a long journey of healing/learning." and that she has seen that "my son has grown and matured." She is pleased that Jesse has taken up beadwork which requires creativity and patience and is something she has been doing for 40 years. She also notes that her son wants to continue with his education and that he has been in contact with the Warm Springs Higher Education Office in Oregon with a view to starting correspondence classes. Lois works as a human resources representative on the Warm Springs Reservation in Oregon. At the pre-sentence interview, Jesse indicated that he hopes to obtain a college degree in counseling and obtain employment as a prison reintegration specialist, besides trying to rebuild his life.

Jesse Wewa lived in Warm Springs, Oregon until 15, when his mother sent him to the Sherman Indian Boarding School in Riverside, California. He attended the school for two years until he was expelled for drinking alcohol. At 16 he got involved with a Native America gang. At 18 he joined the Job Corps in search of a change in the direction of his life and earned his GED. At 24 he began to abuse methamphetamine setting in motion the tragic chain of events that led to his conviction for second degree murder in the death of his stepfather which occurred while Jesse was in a methamphetamine psychotic state.

As far as Indian Country is concerned there are unique cultural and historical factors that continue to resonate in the twenty-first century. According to Ken Gover, former Assistant Secretary of the Interior for Indian Affairs, in remarks acknowledging the 175th anniversary of the establishment of the Bureau of Indian Affairs:

> The trauma of shame, fear, and anger has passed from one generation to the next, and manifests itself in the rampant alcoholism, drug abuse, and domestic violence that plague Indian country. (Quoted in John V. Butcher, *Federal Courts and the Native American Sex Offender,* 13 Fed. Sent. Rep., Sep-Oct., 2000 at 85, 86.

Jesse Wewa, like so many other young Indian men, has been beset by substance abuse problems. He first used alcohol at 12, and methamphetamine at 16. By age 14, he indicated he was abusing alcohol regularly. At 18 he was using alcohol and methamphetamine on a daily basis. In 2004 he stabbed himself while in a methamphetamine induced psychosis. He was enrolled in a 21-day inpatient program at Sundown M Ranch in Sellah, Washington but upon his discharge continued to abuse alcohol and methamphetamine. As previously mentioned, this potent combination of drugs also played its role in his one prior countable conviction.

The subject of addiction and relapse was addressed in a 2007 training seminar held in the federal courthouse in Tucson for prosecutors, defense attorneys, pretrial and probation officers, and judges, entitled 'Meth Addiction & Awareness.' The panel of experts was comprised of Anthony Coulson, DEA Assistant Special Agent-in-Charge; Mary Specio of Cope Behavioral Services; Dr. Leonard Ditmanson, Immediate Past President of the Arizona Medical Association (and former emergency room doctor), and Pastor Larry Mungia of the Sober project. The special focus of the training session was on the methamphetamine crisis. A booklet was provided, *"Drugs, Brains, And Behavior: The Science of Addiction"* published by NIDA (National Institute on Drug Abuse**).** Thus, on the issue of propensity to become an addict:

1    No single factor determines whether a person will
2    become addicted to drugs. The overall risk for addiction
3    is impacted by the biological makeup of the individual -
4    it can even be influenced by gender or ethnicity, his or
5    her development stage, and the surrounding social
6    environment (e.g. conditions at home, at school, and in
7    the neighborhood).

9    Scientists estimate that genetic factors account for
10   between 40 and 60 percent of a person's vulnerability
11   to addiction, including the effects of environment on
12   gene expression and function. Adolescents and
13   individuals with mental disorders are at a greater risk
14   of drug abuse and addiction than the general population.

16   What environmental factors increase the risk of addiction?

18   **Home and Family**. The influence of the home environ-
19   ment is usually most important in childhood. Parents or
20   older family members who abuse alcohol or drugs, or
21   who engage in criminal behavior, can increase children's
22   risks of developing their own drug problems...

24   What other factors increase the risk of addiction?

26   **Early Use**. Although taking drugs at any age can
27   lead to addiction, research shows that the earlier a
28   person begins to use drugs the more likely they are to

progress to more serious abuse. This may reflect the harmful effects that drugs can have on the developing brain; it may also result from a constellation of early biological and social vulnerability factors, including genetic susceptibility, mental illness, unstable family relationships, and exposure to physical or sexual abuse. Still, the fact remains that early use is a strong indicator of problems ahead, among them, substance abuse and addiction.(*Drugs, Brains, And Behavior: The Science Of Addiction,* NIDA, April 2007 at 8-9.)

That these factors are part of the Jesse Wewa's story is to state the obvious.

**The Impact of *Booker et al*.**

As a result of **United States v. Booker**, 125 S.Ct. 738 (2005) where once the sentencing guidelines were binding, now the touchstone is U.S.C. § 3553, and the guidelines remain important as factors, but are reduced to an "advisory" level. The court is to apply its judicial discretion to sentence a defendant to a "reasonable" sentence. In **Rita v. United States**, 127 S.Ct. 2456 (2007) the Supreme Court has reiterated that while there is a non-binding appellate presumption that a guideline sentence is reasonable, a district court may not presume that the guidelines are the correct sentence; he or she must start from scratch and consider all the 3553(a) factors. In **Gall v. United States**, 128 S.Ct. 586, 597 (2007), the Supreme Court has stated that a district court "must make an individualized assessment based on the facts presented." The sentencing principles established by the Supreme Court in the above cases have been formulated as part of ninth circuit law in its decision in **United States v. Carty**, 520 F.3d 984 (9th Cir. 2008) (*en banc*).

**Conclusion**

Based on underlying circumstances of this case and the particularly compelling 18 U.S.C § 3553 (a) factors that have been addressed in this memorandum, the pre-sentence report, and the letters of recommendation, including Mr. Wewa's undoubtedly damaging and very difficult childhood and adolescence, the court is urged to impose a sentence at the low end of the plea agreement range.

RESPECTFULLY SUBMITTED: January 7, 2011

JON M. SANDS
Federal Public Defender

*s/  MICHAEL P.P. SIMON*
Assistant Federal Public Defender

Copy delivered electronically this date to:

Jesse J. Figueroa, Assistant United States Attorney

Alberto Romero, Senior U.S. Probation Officer